E-FILED
Thursday, 08 October, 2020  05:47:32 PM
Clerk, U.S. District Court, ILCD



# **Pohlman**USA®

# Court Reporting and Litigation Services

---

Sherry Benton

September 17, 2020

---

Nathan Cobbs v. Cameron Watson, et al.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

NATHAN COBBS,                       )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 ) No. 18-3205-SLD
                                    )
CAMERON WATSON, et al.,             )
                                    )
        Defendants.                 )

VIDEO CONFERENCE DEPOSITION OF SHERRY BENTON

Taken on behalf of Plaintiff

September 17, 2020

Sherrie L. Merz, RDR, CCR, CSR

CSR No. 084-002840

CCR No. 995

1              INDEX OF EXAMINATION

2                                               PAGE

3    Examination by Ms. Sifuentes              4
     Examination by Mr. Patel                  103
4    Further Examination by Ms. Sifuentes      108

5

                 INDEX OF EXHIBITS
6

7    Exhibit No. 1      Subpoena               5
     Exhibit No. 2      IGRV Inmate History    37
8    Exhibit No. 3      Return of Grievance    45
     Exhibit No. 4      Return of Grievance    53
9    Exhibit No. 5      Response to Grievance  62

10

11

              (The original exhibits were marked by the
12   court reporter and returned to Ms. Sifuentes.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF ILLINOIS
 2


 3
    NATHAN COBBS,                      )
 4                                     )
         Plaintiff,                    )
 5                                     )
    vs.                                )   No. 18-3205-SLD
 6                                     )
    CAMERON WATSON, et al.,            )
 7                                     )
         Defendants.                   )
 8

 9           VIDEO CONFERENCE DEPOSITION OF SHERRY BENTON,
    produced, sworn, and examined on behalf of the
10  Plaintiff, on September 17, 2020, between the hours of
    9:00 a.m. and 12:52 p.m., by video conference, before
11  Sherrie L. Merz, Registered Diplomate Reporter,
    Certified Shorthand Reporter and Certified Court
12  Reporter, and afterwards transcribed into print and that
    signature by the witness is waived.
13

14               A P P E A R A N C E S

15

16           ATTENDED BY VIDEO CONFERENCE:  The Plaintiff
    was represented by Rachel F. Sifuentes, Esq., and James
    P. Gaughan, Esq., of the law firm of Riley Safer Holmes
17  & Cancila, LLP, 70 West Madison Street, Three First
    National Plaza, Suite 2900, Chicago, Illinois 60602.
18

19           ATTENDED BY VIDEO CONFERENCE:  The Defendants
    were represented by Hinal Patel, Esq., of the Illinois
20  Attorney General's Office, 500 South Second Street,
    Springfield, Illinois 62704.
21

22

23

24

25
```

Examination by Ms. Sifuentes

 1          IT IS STIPULATED AND AGREED by and between

 2    counsel that the deposition of SHERRY BENTON may be

 3    taken by and on behalf of the Plaintiff, on September

 4    17, 2020, by video conference, before Sherrie L. Merz,

 5    Registered Diplomate Reporter, Certified Shorthand

 6    Reporter and Certified Court Reporter.

 7                    *  *  *  *  *

 8                    SHERRY BENTON,

 9    of lawful age, being produced, sworn, and examined on

10    the part of the Plaintiff, and after responding, "I do,"

11    to the oath administered by the court reporter, deposes

12    and says:

13                    *  *  *  *  *

14          (On the record at 9:00 a.m.)

15    EXAMINATION BY MS. SIFUENTES:

16       Q.   Good morning, Miss Benton.  Could you please

17    state and spell your full name for the record?

18       **A.   Sherry, S-H-E-R-R-Y, Benton, B-E-N-T-O-N.**

19       Q.   Thank you, Miss Benton.  I'm going to start

20    off by showing an exhibit.  I'm going to represent to

21    you this is the subpoena that we used to subpoena you in

22    this action.  It's just to get us more or less

23    comfortable with how that's going to work, okay?

24       **A.   Sure.**

25       Q.   Okay.  If you'll bear with me for a moment.

Examination by Ms. Sifuentes

1        Q.    Why do you have these staff meetings?

2        A.    To constantly discuss what the boss needs to

3    tell us and updates on things happening statewide with

4    the agency, maybe potential grievances that we're

5    seeing.

6              For example, years ago, the department

7    decided instead of three meals, they would do breakfast

8    and a brunch with the same amount of calories as a lunch

9    and dinner, but they did a brunch.  And our boss at the

10   time had a staff meeting to say the department is doing

11   this.  Be prepared that you might have more grievances

12   on the issue, those sort of updates.

13             We no longer do the brunch, but our unit

14   doesn't always -- we're not privy to every single

15   direction the director may send out.  So our boss would

16   sit in warden meetings, things that apply to our unit.

17   We would have a staff meeting on that update.

18       Q.    Would you ever have staff meetings about one

19   particular grievance?

20       A.    Yes and no.  Maybe one grievance has come to

21   a chairperson's attention to say, hey, for example, this

22   is happening at this facility, be advised as that

23   facility might send in more grievances from their

24   offenders.

25       Q.    So sometimes a grievance is notable, and you

Examination by Ms. Sifuentes

1  expect that other prisoners might grieve the same issue,

2  so you share that in a staff meeting?

3      **A.   Yes.**

4      Q.   Can you give me some examples of those types

5  of grievances?

6      **A.   I knew you were going to ask --**

7          MS. PATEL:  Miss Benton, before you answer, I

8  want to make sure if you're sharing the topic of

9  grievances, don't say any inmate names or anything like

10 that if they relate to medical and personal information

11 for the inmate.

12     **A.   Understood.**

13     Q.   (By Ms. Sifuentes)  All right.  Go ahead,

14 please.

15     **A.   Sure.  And, of course, as I said I've been**

16 **there 17 years.  I know it has happened.  I can't**

17 **remember in several years.  The brunch comes to mind.**

18 **It would be issues like that that either have happened**

19 **statewide or a warden has put the direction of something**

20 **that is happening at his facility.  Nothing leaks out --**

21 **sorry -- at the top of my head.  That hasn't happened in**

22 **quite a few years.**

23     Q.   Getting back to this notable grievance issue,

24 have you had a situation where a particular staff person

25 is being complained about by an unusual number of

Examination by Ms. Sifuentes

1   inmates?

2        A.    I have.

3        Q.    And what do you do when that happens?

4        A.    In my case, it happened to be when Tamms, the

5   super max, was opened.  Tamms has since been closed for

6   probably close to 16 years.  But there was offenders who

7   were housed at that time at Tamms.  I don't recall the

8   officer's name, but I got a lot of grievances on a

9   particular male officer.  I eventually called up

10  internal affairs and said, basically, I see a lot of

11  grievances on this particular officer.  What's with the

12  officer?  And the answer was he's a very good officer by

13  the book and the offenders don't like that.  He gives no

14  -- if they broke the rule, they broke the rule.  They

15  deserve it.  They deserve it, and he doesn't vary.  And

16  that apparently did not sit well with the offenders down

17  there at the time.  So that was that.

18           But I was also told he had never been sent to

19  the employee review board, which is where staff would be

20  referred to.  And he had never been referred or any

21  blemish on his personnel file.  It was just he was very

22  much by the book.

23       Q.    So you received an unusual number of

24  complaints about a particular officer, and this caused

25  you to reach out to internal affairs?

Examination by Ms. Sifuentes

1      **A.    Correct.**

2      Q.    Why did you reach out to internal affairs in

3 this situation?

4      **A.    Internal affairs would be the one to**

5 **investigate staff conduct at that time.**

6      Q.    Does someone else investigate staff conduct

7 currently?

8      **A.    I've got to be honest.   I'm not for sure how**

9 **that gets done these days.   We have a central**

10 **investigation to oversee each facility's internal**

11 **affairs unit.   And I think now the warden and central**

12 **investigations give that direction.**

13      Q.    So if it happened again today and you

14 received an unusual number of grievances by this officer

15 and you wanted to look into it, you could contact

16 central investigation?

17      **A.    I could, or I could attempt to contact**

18 **internal affairs and see what they told me.**

19      Q.    And you mentioned the employee review board.

20 What is that entity?

21      **A.    The employee review board is when staff get**

22 **in trouble, you go before this board.   I've never been,**

23 **knock on wood.   And they decide, I believe, whether or**

24 **not you've broken any state rules or DOC rules and, if**

25 **so, what your punishment should be.   But there's oral**

Examination by Ms. Sifuentes

1    reprimand to days off all the way up to termination.

2         Q.    And internal affairs had that disciplinary

3    information about the employee, and they were able --

4         A.    I was thinking -- I'm sorry.  Go ahead.

5         Q.    I just said and they were able to advise you

6    about it?

7         A.    I think that they at that time they would

8    know.  Again, it's been probably close to 16 years ago.

9         Q.    And the employee that you contacted internal

10   affairs about, the officer, it sounds like you also

11   received some information about his personnel file; is

12   that right?

13        A.    They would have -- any case at that time, if

14   that staff would have been in trouble or a complaint

15   either from another staff person or from an offender

16   would at that time have gone straight through internal

17   affairs.  And from my recollection, they had no file on

18   him.

19        Q.    Understood.  Thank you.  If we could talk

20   about the process of handling appeals a little bit.  How

21   do you receive an appeal?

22        A.    An offender would mail it into our office.

23        Q.    Is there any other way that you receive

24   appeals?

25        A.    We do but that's -- they can only appeal by

Examination by Ms. Sifuentes

1  sending in records themselves.  Sometimes we have

2  offenders who mail their grievance -- which you call an

3  appeal, their grievance -- to outside family members and

4  submit for them.  That is incorrect.  An offender has to

5  submit it directly.

6      Q.   So sometimes you receive grievances being

7  appealed in improper ways?

8      A.   Correct.

9      Q.   What do you do with these improperly

10  submitted appeals?

11      A.   It's been a while since that happened.  I

12  think at one point they were given to the boss at the

13  time, and I've been through -- on my fourth boss, so

14  each boss did it differently.  Sometimes the boss would

15  have clerical write a letter and send it back to the

16  family member on the envelope explaining basically we

17  don't accept them this way and he should submit in the

18  regular manner.

19          I believe one boss would have it all

20  submitted back to the offender with a letter saying we

21  received this from your family.  We don't accept it this

22  way.  You may submit through the regular process.  I

23  believe if an offender has done that he several times

24  with the same grievance, we would just send it to file

25  saying no review as again submitted by family members.

Examination by Ms. Sifuentes

1   same document.  Is this the memo being referred to?

2        **A.    Yes, ma'am.**

3        Q.    Scrolling back to the first page of the

4   document, next to this notation about the memo you've

5   written 12/18/17 T, 2/15/18 B under the date.  What does

6   this refer to?

7        **A.    Again, he submitted one grievance.  At the**

8   **top of that grievance that he submitted within this**

9   **submission, he dated that grievance at the top with the**

10  **date of 12/18/17.  And at the bottom where he signed his**

11  **signature which we refer to as the bottom, he dated it**

12  **February 15 of 2018.**

13       Q.    So the top date in this grievance is the same

14  date as the bottom date from the previous grievance; is

15  that right?

16       **A.    Yes.**

17       Q.    And in the regarding field, you've written

18  assaulted by "three of six" officers; is that right?

19       **A.    Yes.  I added the date 12/15 of '17.**

20       Q.    And you added the date 12/15/17 referring to

21  the date of the assault; is that correct?

22       **A.    Correct, as cited by the offender, yes.**

23       Q.    And this 12/15/17 date is the same date as

24  the top date from the previous grievance; is that

25  correct?

Examination by Ms. Sifuentes

1          **A.    It is.**

2          Q.    So we have an overlapping date of the assault

3   with a date in the previous grievance; is that right?

4          **A.    Say that one more time to me.**

5          Q.    We have an overlapping date of assault in

6   this grievance that's the same date as the top date from

7   the previous week?

8          **A.    What do you mean by there's an overlapping**

9   **date.**

10         Q.    I just mean they're the same date, the exact

11  same date.

12         **A.    It is the same date that he dated his first**

13  **grievance to our office; that is correct?**

14         Q.    So the same date that he put in the top date

15  from his previous grievance he's now saying is the date

16  of the assault in this second grievance, right?

17         **A.    Correct.**

18         Q.    And in both grievances he discussed an

19  assault by three of six officers, correct?

20         **A.    He did.**

21                MS. PATEL:  Rachel, I don't mean to

22  interrupt.  I want to make sure the record is clear.

23  You were asking about whether the 12/18 date on this

24  document was the same as the top date on the previous

25  exhibit that you were showing her.  And I don't believe

Examination by Ms. Sifuentes

1    it is.  It's the bottom date on the previous exhibit.

2         Q.   (By Ms. Sifuentes)  Okay.  I think I said the

3    top date, but I think what I'm getting at is we can

4    agree that the top date from the previous grievance is

5    now the date that Mr. Cobbs wrote as the date of the

6    assault in his current grievance, correct?

7         **A.   Correct.**

8         Q.   So now you know the date that he's claiming

9    the assault occurred?

10        **A.   In this second submission, yes.**

11        Q.   And it's the same date he has as the top date

12   from the previous grievance?

13        **A.   It is.**

14        Q.   And both grievances are about the same

15   assault by three of six officers?

16        **A.   They are very similar but yes.  The crux of**

17   **both grievances are both about being assaulted by staff.**

18   **You are correct.**

19        Q.   Do you think that Mr. Cobbs was resubmitting

20   his grievance to you with more information?

21        **A.   He did, yes.**

22        Q.   And none of the boxes are checked for

23   additional information required on this form, right?

24        **A.   That is correct.**

25        Q.   The only box checked on this form is not

Examination by Ms. Sifuentes

1    submitted in the time frame outlined in Department Rule

2    504.  Therefore, this issue will not be addressed

3    further, right?

4         **A.   That is correct.**

5         Q.   And this grievance was received by you on

6    April 3rd, 2018?

7         **A.   Correct.**

8         Q.   And so why is this grievance not submitted in

9    the time frame within the rule?

10        **A.   The rule states that when you are at the same**

11   **facility that your issue occurred, you have to file a**

12   **grievance within 60 days to the grievance officer at**

13   **that facility.  So in this second submission, he writes**

14   **in his grievance that the incident occurred on 12/15.**

15   **He didn't get it to the grievance officer until**

16   **March 1st.  He had until February 15th to do that.**

17        Q.   So you determined from the paperwork that you

18   don't think he submitted it to the grievance officer

19   within the time frame allowed?

20        **A.   Correct.**

21        Q.   And why did you underline the part in this

22   form that says this issue will not be addressed further?

23        **A.   Because he's not met the time frame for this**

24   **submission.  It's already April.  If that's the first**

25   **time he's filing it, and it's already outside time**

Examination by Ms. Sifuentes

1    frames, subsequent submissions aren't going to meet time

2    frames.

3         Q.    Right.  But why did you specifically

4    underline the words this issue will not be addressed

5    further?

6         A.    For the reason I just gave you.

7         Q.    Could Mr. Cobbs have submitted his original

8    grievance with a counselor's response and had his

9    grievance heard by you if the response was within the

10   proper time frame?

11        A.    No, because he needs the grievance officer's

12   report also.  He needs both from the facility.

13        Q.    So he needs the counselor's response and the

14   grievance officer's response in order for the ARB to

15   consider his appeal?

16        A.    That is what the DR says, yes, and that's

17   what we advised him to do back in December.  But as you

18   can see from these grievances so -- if I signed it

19   December 28th, he probably received it shortly after the

20   New Year, maybe January 5th through the 10th because it

21   is holiday season.

22             So the second submission, he doesn't state

23   that he finalized the grievance until almost two months

24   later.  Why, I don't know, because we would have told

25   him back in January and given him ample time to

Examination by Ms. Sifuentes

1    resubmit.  He had until February 15th to get it to

2    staff.

3              But yet he dates the agreement February 15th

4    and waits until March the 1st to submit it to staff.

5    Now, had he gotten it to staff timely, I would have

6    reviewed it.  But he did not, so I can't.

7         Q.   Does the ARB have any discretion to waive

8    these requirements of the copies of the counselor's

9    response and the grievance officer's report?

10        A.   Not in the same facility.  Now, if he would

11   write a letter saying I just got confirmed this; I

12   initially filed this but I left or I couldn't file it

13   because the very next day after the incident, I went on

14   a court writ.  And I was there for three months and just

15   got back today, so I'm filing it, of course.  If he's

16   not physically at the facility, then there wouldn't be a

17   way for him to file it.

18              But that does not appear to be the case here.

19   He's at the facility.  In fact, I looked it up today.

20   He didn't leave there until 2019.  There was no

21   movement, not a court writ, not a medical furlough.

22   He's at Western until he leaves in 2019.

23        Q.   So he could write you a letter explaining

24   circumstances that prevented him from submitting the

25   copy of the grievance officer's report and counselor's

Examination by Ms. Sifuentes

1       **A.    If he would have resubmitted the grievance, I**

2   **would have then wrote a new form telling him please**

3   **check with staff for updates.  I probably would have**

4   **looked at CHAMP entries to see if he even did submit it**

5   **to them.  And if I saw those entries, I probably would**

6   **have wrote on my comments section below or above where I**

7   **sign my name, records reflect they're working on it.**

8   **Please be patient.  You can continue to ask for updates**

9   **with staff.  But, of course, I didn't get those**

10  **questions.**

11      Q.   (By Ms. Sifuentes)  Right.  But the ARB,

12  would you have any discretion to accept his grievance

13  without this officer's report?

14      **A.    No.**

15      Q.   No.  You would have just kept sending it back

16  to him and telling him to wait for a response?

17      **A.    Correct.  Unfortunately there's, only one**

18  **grievance officer to answer for anywhere from 1500 to**

19  **2,000 inmates.  That's the process.  But if filed**

20  **correctly, you will get a response.**

21      Q.   Is it possible that a response could be lost

22  in the mail?

23          MS. PATEL:  Object to the form of the

24  question.  Miss Benton, you can answer if you know.

25      **A.    I can't answer that.  I mean, I guess**

Examination by Ms. Sifuentes

1   anything is possible.  But based on the mail that our

2   office gets, that we get, we get quite a bit of mail.  I

3   haven't come around anything where -- usually when an

4   offender said it's lost, it's just simply we're

5   backlogged and it takes time to do a good research.

6   From what I gather from the facility, their response

7   would have been sent through institutional mail.  So it

8   wouldn't have left the institution to come to us, that

9   goes out of the institution to the U.S. Postal Service

10  like any other mail would to you or I.

11       Q.   (By Ms. Sifuentes)  It sounded like you were

12  saying offender's sometimes tell you that their response

13  is lost.

14       A.   They think that, because it takes so long.

15  And, unfortunately, they are offenders.  They do think

16  staff forgets them when they are not.  And conspiracy

17  theories abound.  And oftentimes when they do write to

18  us saying things like they won't answer me, they could

19  simply ask staff at the facility what's the status.

20            All I do is look up on the computer, see if

21  it's being worked on and write them back and say it's

22  still being worked on.  Please continue to be patient.

23  In the future just ask staff where it's at.  You will

24  get a response.  Once you do, just submit all of it here

25  to us.

Examination by Ms. Sifuentes

1      Q.   So this grievance of Mr. Cobbs was designated

2    an emergency grievance by the chief administrative

3    officer, right?

4      **A.   It was, yes.**

5      Q.   And yet it also took over four months for the

6    grievance officer to respond to it, right?

7      **A.   It did.**

8      Q.   Is that typical in your experience for

9    emergency grievances to take several months before a

10   response is given to the offender?

11         MS. PATEL:  I'm going to object to the

12   question or the form of the question and to foundation.

13   Miss Benton, you can go ahead and answer if you know the

14   answer.

15     **A.   As a rule of thumb, no, it doesn't take that**

16   **long.  But you would have to ask that grievance officer,**

17   **you know, why it took four months.  Was she off work,**

18   **have to wait on internal affairs to look into something**

19   **and get her response back?  I don't know.  And if that's**

20   **the case, if internal affairs were looking into**

21   **something, it would take a while.  But that's something**

22   **you'd have to ask the facility if they recall why it**

23   **took four months.**

24     Q.   (By Ms. Sifuentes)  As a rule of thumb, this

25   time period is not typical.  What is a typical time

Examination by Ms. Sifuentes

1    period for a response to an emergency grievance?

2         MS. PATEL:  Object to the form and foundation

3    of the question.  Go ahead.

4         **A.    Typically, you would see it within a month,**

5    **but I don't know what was happening at the facility**

6    **level.  You would have to ask them for why there was a**

7    **delay.**

8         Q.   (By Ms. Sifuentes)  Then in your experience,

9    the time period can vary, but it's typically within a

10   month to respond to an emergency grievance?

11        **A.    Yes, on average.**

12        Q.   I'm going to stop showing this document.

13   Miss Benton, we talked a little bit earlier about staff

14   meetings of the ARB.  And you mentioned they could be

15   for various reasons.  Do you have staff meetings about

16   use of force grievances?

17        **A.    I don't recall one specifically about use of**

18   **force, no.**

19        Q.   Have you had staff meetings about particular

20   officers?

21        **A.    No.**

22        Q.   And, I'm sorry, I'm going to go a little bit

23   to the discussion we had about when you make a decision

24   on a grievance.  You've been dealing with grievances

25   that in our case weren't reviewed on the merits.  Would

Examination by Ms. Sifuentes

1   that be an accurate way to describe it?

2        **A.    Sure.**

3        Q.    But you do get grievances that are properly

4   submitted according to the rule; is that right?

5        **A.    Sure.**

6        Q.    And in those circumstances, what do you do

7   with that grievance as the next step?

8        **A.    Well, if he submitted it timely, like he**

9   **filed it timely to the facility, he got their response,**

10  **he submitted what he wrote, what they wrote timely to**

11  **our office, you read the grievance.  You read what staff**

12  **wrote and ensure that staff has the appropriate answers**

13  **to his issue.  If not, if they feel he hasn't or they**

14  **didn't review every issue, then you would research**

15  **whatever it took to get him that answer.**

16       Q.    Okay.  So sometimes you refer a grievance for

17  more activity to be done to address the offender's

18  issue?

19       **A.    I have.  It's called remand or remanding a**

20  **grievance.  Sure, I have.**

21       Q.    Approximately what percentage of grievances

22  do you remand?

23       **A.    I would say less than 10 percent probably.**

24       Q.    Uh-huh.  And so what about the other 90 or so

25  percent of those grievances?  What are you doing with

Examination by Ms. Sifuentes

1   those?

2        A.    Well, I can only say that staff made the

3   appropriate -- or addressed all the issues and did it

4   correctly.

5        Q.    Okay.  So staff addressed all the issues

6   appropriately.  What do you do with the grievance?

7        A.    Let me rephrase.  There are grievances that

8   come with tickets, but they're different than property,

9   medical, staff.  So tickets have various time frames for

10  tickets to be written, served, heard.  So if he would

11  file a grievance on a ticket and everything was timely,

12  when I review those there's a different set of criteria

13  that also goes along with the ticket.

14            And the grievance process, I expunge tickets

15  meaning something was in the ticket that didn't meet the

16  time frame.  So in those cases, I would absolutely

17  affirm his grievance and expunge the ticket off his

18  record.  So those do occur.  Sometimes I remand those

19  back to add more to the ticket or to add more to the

20  basis.  But tickets come with a whole different set of

21  criteria also.

22            So when we're just talking about staff and

23  medical, again depending on what the inmate wrote in his

24  grievance and how staff answered that, if they answered

25  all of his issues and I felt they answered them

Examination by Ms. Sifuentes

 1    appropriately, there's nothing else for me to research.

 2    Typically, that grievance is denied.

 3              Grievances can be ruled mixed, that for

 4    example with medical, records confirm that you didn't

 5    get your meds on this day, you got them on the following

 6    day, but you were supposed to get him the day you said,

 7    but you didn't.  Here's why.  The pharmacy which is

 8    outside the control of DOC didn't have that in stock.

 9    We had it the next day.

10              So that would be a misruling and you tell the

11    offender you are correct.  You did not get them that day

12    that you claimed.  However, you did get them the next

13    day, and the reason that you didn't get them was because

14    they were out of stock and they didn't have them to give

15    to you.  So that could be a misruling.

16              I could remand that back to get that answer,

17    but if staff provided that answer, there wouldn't be a

18    reason to research more.  Does that make sense, I hope?

19         Q.   Yes.  No, that's helpful.  Thank you again.

20         A.   So, again, sorry I can't give cut and dry

21    answers, because grievances are not cut and dry.  It

22    depends on what the inmate writes.  Depends on the issue

23    that he brings up.  Depends on what staff look at and

24    answer.  We are human.  He writes five issues and they

25    only check four.

Examination by Ms. Sifuentes

1           But yes, all we can look at -- this one that

2     they didn't.  And I can research that on my own and get

3     the answer or I can officially remand it back and make

4     them get the answer for me.  But it's probably just

5     quicker for me to e-mail the appropriate staff, get the

6     answer and move about my day.

7           Q.   Let me show you the staff member we were

8     looking at before, and we can talk about Mr. Cobbs'

9     grievance, if you'll bear with me.  Is it now loaded for

10    you?

11          A.   I see that.

12          Q.   And this is a document I don't think you

13    have, but we talked about it, the grievance officer's

14    report.

15          A.   Correct.  Our office did not receive that.

16          Q.   Right.  And there's a section for the facts

17    reviewed; is that correct?

18          A.   Correct.

19          Q.   Are you able to read this?  Is it large

20    enough, visible for you to see?

21          A.   I can probably come up and read it.  Yes.

22    We'll stumble through it.

23          Q.   Let me see if I can make it easier for you to

24    look at.  I don't know if zooming in is helping.

25          A.   I can see it.  It's cut off, so if there's a

Examination by Ms. Sifuentes

1    control bar.  If not -- I can make do with whatever you

2    had up there.  Yes, I can see that.

3         Q.    Is that visible enough to read?

4         A.    Sure.

5         Q.    All right.  Could you read the text that's on

6    the screen to yourself?  And let me know when you're

7    done reading this entire page, okay?

8         A.    Yes.  Okay I've read it.

9         Q.    Okay.  You've read it, and this describes

10   that Mr. Cobbs filed an emergency grievance and said he

11   was assaulted by three officers; is that right?

12        A.    Yes, he alleges assault by officers.

13        Q.    Uh-huh.  And then a lieutenant from internal

14   affairs responded to the officer, his grievance officer,

15   that all the staff involved were interviewed, right?

16        A.    Yes.  That's what that says.

17        Q.    And the interviewed staff denied the

18   allegation.

19        A.    Yes.

20        Q.    And they said that what happened was offender

21   Cobbs refused medical treatment and he had

22   self-inflicted wounds.

23        A.    That is what that states.

24        Q.    And they determined that the allegations were

25   unsubstantiated.

Examination by Ms. Sifuentes

1      **A.    Correct.**

2          Q.    And then Mr. Cobbs was interviewed by the

3      grievance officer and said he didn't have anything more

4      to say.

5          **A.    That is correct.**

6          Q.    And he also said nothing had happened since.

7          **A.    Correct.**

8          Q.    And then the officer put a note that the

9      inmate may request a transfer through his correctional

10     counselor if eligible?

11         **A.    Correct.**

12         Q.    And he had requested as relief to file

13     criminal charges on staff and to be transferred.

14         **A.    That is what is written, yes.**

15         Q.    And the recommendation made based on all of

16     the information of the report by the grievance officer

17     was that the grievance be moot.

18         **A.    That is what's stated, yes.**

19         Q.    If Mr. Cobbs had appealed this to the ARB,

20     what would the ARB do with this appeal?

21             MS. PATEL:  Objection to the form and

22     foundation, but you can answer.

23         **A.    I'd have to read what he changed in the**

24     **grievance, because it appeared when you showed the slide**

25     **about the grievance compared to the one I originally got**

Examination by Ms. Sifuentes

1    from him, he scribbled some stuff and added and changed

2    it.  So I would have to read it.

3        Q.   (By Ms. Sifuentes)  Uh-huh.

4        A.   I would read this.  It appears internal

5    affairs did do an inquiry.  Again, these are summarized

6    or paraphrased.  It says all staff involved interviewed.

7    So I don't know if that means just from reading this

8    just the three that were accused of assaulting him or

9    that the others that he writes were also present.

10            The second line it says inmate stated and I

11   assume they're taking it from his grievance when they

12   write inmate states, Howell, Mayer, Scoggs, Session,

13   Scheffler and Lindsey.  So six are present, but he

14   claims three assaulted him.  I can only assume that all

15   six were interviewed as the inmate states the other

16   three were present, but they didn't do the assaulting.

17            So you have three that aren't accused of

18   anything that I assume were being interviewed about the

19   allegations against the other three.  I would probably

20   have called up Lieutenant Durell and asked for more

21   information, is that correct?  Because again he's --

22   internal affairs does not provide the paperwork or

23   investigative files.  So he would have just given a

24   quick answer.

25            But I probably would have called him up and

Examination by Ms. Sifuentes

1  said am I correct in assuming the other three were also

2  interviewed or present and would have witnessed any

3  alleged wrongdoing and give statements to that effect.

4  Because the inmate writes according to the grievance

5  officer that they were present.  So I probably would

6  have gotten verification on that and made a decision.

7      Q.   Is it your understanding that internal

8  affairs has paperwork or files related to the inquiry

9  that they conducted, and you would have asked them for

10  clarification based on those records as to what

11  Lieutenant Durell means when he says all staff involved

12  were interviewed?

13      A.   Correct.

14      Q.   You would have also read the grievance from

15  the offender to get information about his version of the

16  event; is that correct?

17      A.   Yes.  I also would have checked any CHAMP

18  entries that were written on or around those days.  I

19  would have -- I'm curious about if he refused medical

20  treatment for self-inflicted wounds.  I definitely

21  probably would have contacted medical as to what his

22  medical chart shows for that specific issue.

23           It says Cobbs was placed in IS, which is

24  investigative status, so I would have checked his

25  disciplinary card that tells me he's getting a ticket,

Examination by Ms. Sifuentes

Page 81

1    like he is violating some rules and was upset over

2    allegations over pending charges.  So is pending charges

3    IDOC charges, or is pending charges like outside like a

4    state's attorney is going to place charges against him?

5            And so what occurred to me is he's being

6    escorted to investigative status because either he's

7    getting a ticket from us and doesn't want to go to seg,

8    and he's causing a ruckus and there's an incident, so it

9    wouldn't take six of staff to escort him to a seg cell.

10   So just in my experience, this tells me that the

11   offender is acting up to where staff feel they need more

12   than two people to escort him to seg.

13        Q.   Uh-huh.

14        A.   If there was an incident of that type of

15   occurrence, incident reports would be written by staff.

16   I may have also asked the warden's office for any, if

17   any exist, incident reports written by staff for this

18   day on him with any of the six officers' names being

19   mentioned.

20            So all of those are at my disposal, and I

21   would probably have asked for the information, looked at

22   it and made a decision based on all of that.

23        Q.   One of the things you mentioned was looking

24   at CHAMP entries.  What does CHAMP stand for.

25        A.   CHAMP is an acronym for -- basically it's

Examination by Ms. Sifuentes

1    counseling information.  Any time staff have contact

2    with an offender, typically it's your counselor.  That's

3    who you'll see when they have contact with an offender.

4    They'll write saw offender today.

5              He had no issues or he requested more

6    grievance forms or wanted to know about when he's going

7    to yard.  It's just their daily contact.  Now, like I

8    said, a couple years ago we started a statewide

9    grievance receipt, so now there are more entries.

10             Any time staff get a grievance, typically

11   it's your counselor who writes received grievance this

12   day and what they are doing with it.  And then the

13   grievance officer if the inmate sent it to them would

14   say received this grievance.  And what the CHAMP entry

15   said, they handed the inmate a receipt.

16             There's a lot of mail room entries.  Each

17   facility is different.  Any time an inmate sends legal

18   mail out, the mail room logs it into the CHAMP.  Our

19   office will log some CHAMP entries.  Any time staff has

20   a family member on the phone asking questions, they'll

21   log it.

22             So you get an overall picture of he -- it's a

23   rule.  For being on the outside, meaning -- I'm not at

24   that facility -- of what life is like for him.  If he's

25   making a complaint, if he's asking about school, if he's

Examination by Ms. Sifuentes

1    started to work, if he has any issues with the staff.  I

2    mean, those would usually be documented other than

3    confidential.  Health care doesn't comment in these sort

4    of entries.

5        Q.   Okay.  It sounds like you take several steps

6    of investigation to evaluate the appeal.  What are you

7    trying to ultimately determine to make your decision?

8        A.   So my decision making is to make sure staff

9    did their job.  They investigated this claim, they

10   looked at everything I would look at, and they made a

11   determination.  I can't find staff guilty or not guilty

12   of something.  My job is to ensure at the facility level

13   that they did that.

14       Q.   And what kind of relief, if any, could you

15   have given to Mr. Cobbs if you found that staff did not

16   properly do that investigation?

17       A.   Well, if an investigation was done, I can

18   only go by what they found in their investigation.  I am

19   not internal affairs.  I don't have that power.  All I

20   can say is they did investigate it, and here's what they

21   found.  However, if staff didn't investigate it, I can

22   certainly remand that back and have the warden have it

23   looked into.  That I can do.

24             But what the outcome of that investigation is

25   is out of my control and out of my decision.  I don't

Examination by Ms. Sifuentes

1    have that authority to tell you if staff did or didn't

2    do something.  I can only ensure that it was looked

3    into.

4        Q.   Understood.  We were talking about how there

5    were six officers present according to Mr. Cobbs, as

6    reflected in this report.  And it was unclear from this

7    notation how many of the staff were interviewed; is that

8    right?

9        A.   It is to me.  But the other chairmen when

10   they read that may not think that.  But "all staff

11   involved," it could be that I tend to pick apart words

12   in sentences too much.  But all staff involved, does

13   that mean the three involved in the assault, or did that

14   mean the total of six?  It's just how I read that

15   sentence.

16       Q.   I understand.  If you had contacted internal

17   affairs and they told you only the three accused

18   officers were interviewed and the other three were not,

19   what kind of recommendation would you have made?

20            MS. PATEL:  Objection.  Form.

21       A.   It tells me that if they were not near the

22   incident or they had walked off and went to different

23   building, well, then there would be no reason to

24   interview them as they're not present.  But if they were

25   present and were there the whole time, then yes, I would

Examination by Ms. Sifuentes

1    **remand that back saying you've got to get the other**

2    **three answers.**

3         Q.   (By Ms. Sifuentes)  Uh-huh.  So depending on

4    the facts and circumstances, you may or may not

5    recommend more investigation?

6         **A.   Correct.**

7         Q.   Okay.  I'm going to stop showing this

8    document.

9              (Reporter clarifies exhibit number.)

10             (Off the record at 11:45 a.m.  Back on the

11   record at 11:54 a.m.)

12        Q.   (By Ms. Sifuentes)  I'm going to share a

13   document.  It's just going to take me two seconds

14   please.  Okay.  And I think you also have a copy, Miss

15   Benton, but this was the return of grievance dated

16   April 10th, 2018, Exhibit 4 in this deposition.  And

17   you're able to see it?  You have a copy?

18        **A.   Yes, I do.**

19        Q.   Great.  I'm just going to scroll down to the

20   third page of that document.  It has 137 number on the

21   bottom.  Can you see that?

22        **A.   I do.**

23        Q.   And you see these stamps in the counselor's

24   response area of the document?

25        **A.   Yes.**

Examination by Ms. Sifuentes

1      Q.   And one of the stamps is for received by the

2   ARB; is that correct?

3      **A.   Yes.**

4      Q.   And then there's another stamp, it looks like

5   it says grievance office, maybe officer; is that right?

6      **A.   Yes.**

7      Q.   And so was this second stamp on the document

8   when it was received by ARB?

9      **A.   Yes.**

10      Q.   And so does this tell you that this grievance

11   was received by the grievance officer at the

12   institution?

13      **A.   Yes.  It appears it was received on**

14   **March 1st.  That's what the grievance officer ruled on,**

15   **although you can't see the date on our copy.  I can only**

16   **say that it's March 1st because that's what their memo**

17   **says.  The date received was March 1st.  So I can only**

18   **assume that's a March 1, 2018, stamp.**

19      Q.   Right.  So it was received -- can't see the

20   date in this receipt stamp?

21      **A.   Correct.**

22      Q.   We just have this date from the memo prepared

23   by the grievance officer.

24      **A.   Yes.**

25      Q.   Now, you know from the -- you now know that

Examination by Ms. Sifuentes

1    the other documents that I showed you that Mr. Cobbs

2    submitted his grievance to the warden, and it was

3    accepted as an emergency grievance in January 2018?

4        A.   Yes.

5        Q.   And then would you say this is a duplicate

6    that he submitted to the grievance officer at the

7    institution?

8        A.   I don't know.

9        Q.   You don't know.  What do you think he was

10   trying to do with this --

11       A.   I think what he's done is -- in my opinion

12   what he's done is he clearly has submitted multiple

13   grievances.  Whether they're the same, I don't know.  I

14   don't know that that grievance is the one that they

15   officially reviewed.

16           I would say no, because there's no other

17   stamps on it other than ours and the March 1.  So the

18   one he submitted back in January is not this one.  So

19   because he's not getting an answer from them, he hasn't

20   heard from them by March, he's submitting again.

21       Q.   Yeah.

22       A.   And so they rule in March that that

23   submission is over 60 days, and they are correct.  Now,

24   could they have also told him somewhere on this form,

25   hey, he have one pending, it's number -- whatever that

Examination by Ms. Sifuentes

1    emergency grievance number was.  It was at the top of

2    that grievance.  That's still pending here.

3         Q.   Uh-huh.

4         A.   That probably would have -- yes.  But again,

5    I think he received a receipt saying in January we've

6    got it and are working on it.  Rather than asking them

7    for an update, it appears he just files another one

8    which again staff treat as another individual submission

9    and answer it as such.

10        Q.   Right.  So it sounds like you were saying

11   staff can treat it as another individual submission and

12   answer it as such.  Or if they realize it's about the

13   same incident, and there's a grievance already pending,

14   they can respond with information about the pending

15   grievance; is that right?

16        A.   Correct.  They still would have ruled this

17   untimely, but where it says other on that form, they

18   could have said, hey, you've already submitted this

19   issue.  It's currently pending here.  Sit tight.  You'll

20   get an answer.

21        Q.   Uh-huh.  And you've seen staff do it before

22   with other grievances?

23        A.   I have.

24        Q.   I'm going to show you a different document.

25   This is the grievance officer's report that we were

Examination by Ms. Sifuentes

1    discussing before.  You don't have a copy, but can you

2    see it on the screen?

3        **A.    Yes.**

4        Q.    And we talked a little bit before about the

5    relief Mr. Cobbs suggested.  I'd like to revisit that

6    with you a bit.  It was in this section of the grievance

7    officer's report that Mr. Cobbs requested to file

8    criminal charges on staff and to be transferred.  Had he

9    appealed the grievance, would you have been able to

10   provide that requested relief?

11       **A.    No.**

12       Q.    Why not?

13       **A.    He would need an attorney to press criminal**

14   **charges, or he could be his own attorney.  It's no**

15   **different for him asking me if I wanted to press**

16   **criminal charges.  He would have to bring the**

17   **information to the state attorney's office, and they**

18   **would be the ones to decide whether or not they were**

19   **going to press charges.  So that's not in IDOC's realm.**

20   **I've given him the same answer on the transfer.  Starts**

21   **with the counselor.  You have to request it, then go**

22   **from there.**

23       Q.    So with regards to his request to file

24   criminal charges, ARB doesn't have the authority to

25   grant that request?

Examination by Ms. Sifuentes

1      **A.   We do not.**

2      Q.   And with regards to his request to be

3  transferred, there's a separate process for that, and he

4  would have to use that process beginning with contacting

5  his correctional counselor?

6      **A.   That is correct.**

7      Q.   I am going to show you another document.  I

8  believe this is a document you do have, return of

9  grievance.  This is your first grievance dated December

10  28 of 2017.  And can you see it or do you have your

11  copy?

12      **A.   Yes.**

13      Q.   We talked about the box of additional

14  information that you determined you required from the

15  grievance that he submitted at the time.  And the first

16  item on that list was the counselor's response of the

17  original grievance, correct?

18      **A.   Yes.**

19      Q.   Now, I'm looking at Section 504.840,

20  emergency procedures.  My understanding from this

21  section that if a grievance is an emergency grievance,

22  there won't be a counselor's response because it goes to

23  the warden; is that correct?

24      **A.   Yes and no.  So if it's turned over to the**

25  **warden, if he rules not an emergency, then he would have**

Examination by Ms. Sifuentes

1    no reason to file it.  He needs to go through the

2    regular process and get the counselor's response.  If he

3    concurs it is an emergency, that is correct.  It goes to

4    the grievance officer.  And what, in theory, is supposed

5    to happen is it goes to the front of all others that are

6    waiting to be answered.

7         Q.    Thank you for that clarification.  So in

8    Mr. Cobbs' case, the warden accepted it for emergency

9    review and, therefore, it goes to the front and there is

10   no counselor's response to provide?

11        A.    Correct.  That is what happened on the one

12   that he filed correctly.

13        Q.    If he was appealing the grievance he filed

14   correctly, you don't need the counselor's response, but

15   you do need the grievance officer's report and the chief

16   administrative officer's decision?

17        A.    Yes.

18        Q.    And you've also selected that you needed the

19   date when the incident occurred, but Mr. Cobbs corrected

20   that as well in his other grievance; is that correct?

21        A.    If I understood you -- I'm sorry.  Just

22   repeat the question.

23        Q.    Ms. Merz, can you read my question again,

24   please?

25              (Transcript read by the reporter as

Examination by Ms. Sifuentes

 1  requested.)

 2          MS. PATEL:  Objection to form of the

 3  question.  Miss Benton, you can answer if you know.

 4      **A.    In his second grievance to us, yes.**

 5      Q.  (By Ms. Sifuentes)  Thank you, Miss Benton.

 6  I'm going to show you another document.  I'm going back

 7  to the grievance officer's report.  I missed something.

 8  You recall we were discussing that the grievance officer

 9  responded or completed a report and recommendation, I

10  should say, on this grievance on May 25th, 2018, right?

11      **A.    Yes.**

12      Q.    And then she submitted it to the CAO who made

13  a decision on May 29th, 2018?

14      **A.    Yes.**

15      Q.    And my understanding from the Administrative

16  Code Section 504.850 appeals is what the ARB must

17  receive if appealed within 30 days after the date of the

18  decision; is that correct?

19      **A.    Yes.**

20      Q.    Does the 30 days after the date of the

21  decision in this first section refer to this date that

22  the CAO made a determination?

23      **A.    Yes.**

24      Q.    So Mr. Cobbs' appeal was due within 60 days

25  from May 29th, 2018?

Examination by Ms. Sifuentes

1    can go on.  The question was have you ever had an

2    incident where you received grievances about an officer

3    that were of such a severe nature that it caused you to

4    reach out to internal affairs?

5         **A.    No.**

6         Q.    Have you received -- sorry.  Let me start

7    over.

8         **A.    Can I interject one thing?  Can I interject**

9    **one comment.**

10        Q.    Oh, sure.  What do you need?

11        **A.    When you -- the question that you just asked,**

12   **PREA, the Prison Rape Elimination Act, I think would**

13   **fall under the category of something so severe.  But**

14   **those have their own processing.  Those come to mind**

15   **because they're allegations against rape and sexual**

16   **assault.  But those have their own processing, and I**

17   **don't think that's what you were asking when you asked**

18   **if something was so severe that I would contact internal**

19   **affairs.  Because PREA from federal guidelines**

20   **immediately goes to internal affairs.**

21        Q.    I understand.  You just want to clarify that

22   there's a separate process for grievances related to

23   rape because of that?

24        **A.    Yes.**

25        Q.    And so those are treated differently, and

Examination by Ms. Sifuentes

1  that's a separate category, and it's a severe issue?

2      **A.   Correct.**

3      Q.   I was going to ask about excessive force

4  incidents.  Have you had grievances of the severity of

5  excessive force alleged that caused you to reach out to

6  internal affairs?

7          MS. PATEL:  Object to the form of the

8  question.  Same objection as before.  Miss Benton, you

9  can answer if you know.

10     **A.   Yes.**

11     Q.   (By Ms. Sifuentes)  Under what type of

12  circumstance?

13     **A.   I don't remember specifically, but I do know**

14  **that based on what the offender wrote, I have called**

15  **internal affairs and had it presented where either no,**

16  **it didn't happen or yes, it did happen.**

17     Q.   And one of the defendants in this case is

18  Officer Todd Scheffler, correct?

19     **A.   Yes.**

20     Q.   And have you had grievances concerning

21  Officer Scheffler sent to you?

22     **A.   I would have to query that database to see if**

23  **his name came up.  But no, he does not ring a bell to**

24  **me.  But that doesn't mean I haven't answered grievances**

25  **on him.**

Examination by Ms. Sifuentes

1     Q.    It doesn't ring a bell, doesn't stand out,

2    Officer Todd Scheffler?

3     **A.    That is correct.**

4     Q.    Mr. Cobbs' grievance made allegations against

5    Officer Todd Scheffler, correct?

6     **A.    It does.**

7     Q.    Is that grievance the only grievance you're

8    aware of that contains allegations about Officer

9    Scheffler?

10     **A.    For Mr. Cobbs, yes, these two submissions.**

11     Q.    Are you aware that Officer Scheffler has been

12    indicted for an assault against an inmate that

13    eventually led to the inmate's death?

14            MS. PATEL:  I'm going to object to the form

15    of the question and that it's outside the scope of this

16    deposition.  Miss Benton, I'm going to instruct you not

17    to answer the question.

18            MS. SIFUENTES:  I'm trying to probe into the

19    issue of why this particular grievance was so delayed.

20    By Miss Benton's own testimony, this is unusual

21    treatment of this grievance, and it's concerning an

22    officer who has also been indicted for murder.  I think

23    it's a relevant issue.

24            MS. PATEL:  Let's go off the record briefly.

25            MS. SIFUENTES:  Okay.

Examination by Ms. Sifuentes

 1              (Off the record at 12:23 p.m.  Back on the

 2      record at 12:27 p.m.)

 3              MS. SIFUENTES:  Can you repeat my question,

 4      please?

 5              (Transcript read by the reporter as

 6      requested.)

 7              MS. PATEL:  And I object to the question, the

 8      form of the question, and I will advise Miss Benton not

 9      to answer the question.

10      Q.   (By Ms. Sifuentes)  Miss Benton, are you

11      going to follow your attorney's advice and refuse to

12      answer the question?

13      **A.    I am.**

14      Q.   All right.

15              MR. GAUGHAN:  And, Rachel, you will want to

16      confirm that all similar questions along that line will

17      receive the same objection.

18              MS. SIFUENTES:  Is that correct, Hinal?

19              MS. PATEL:  I don't want to make a blanket

20      statement, because I'm not sure everything you're going

21      to ask.  So if you want to ask the questions and I'll

22      make the objections for the record, I think that might

23      be preferred.

24              MS. SIFUENTES:  Yeah, that's fine.  I

25      proffered for you that in the alternative I was going to

1  ask questions to establish whether or not Miss Benton

2  has any knowledge of appeals concerning inmate Larry

3  Earvin who died, involving Officer Todd Scheffler who is

4  also a defendant in this action and also the subject of

5  plaintiff Cobbs' appeal.  Will you make the same

6  objection and also instruct the witness not to answer.

7            MS. PATEL:  Yes.  I'm going to object to the

8  line of questions as it's outside the scope for the

9  purposes of this deposition regarding whether Mr. Cobbs

10  exhausted administrative remedies as it pertains to the

11  allegations in this case and stand by my request or

12  instruction that Miss Benton not answer this line of

13  questioning.

14      Q.   (By Ms. Sifuentes)  Miss Benton, you would

15  follow your attorney's advice; is that correct?

16      **A.   That is correct.**

17            MS. SIFUENTES:  And the plaintiff's position

18  is that the line of questioning is relevant.  Miss

19  Benton testified earlier that under circumstances where

20  multiple grievances are received concerning the same

21  defendant, depending on the circumstances, he might

22  request that internal affairs take action or send

23  information of other departments.

24            Here we have an inmate grievance that was not

25  responded to within a reasonable time frame.  Miss

Examination by Ms. Patel

1    Benton testified that it was an unusually long length of

2    time.  And Mr. Cobbs also never received a response to

3    his grievance.  For these reasons, we believe it is

4    relevant whether there are circumstances that if

5    grounds, the officials involved would delay or inhibit

6    Mr. Cobbs' ability to appeal this ARB.

7              With that, I am done with my questioning and

8    turn it over to Miss Patel for questions of the witness.

9    EXAMINATION BY MR. PATEL:

10        Q.   Miss Benton, I just have a few questions and

11   we can get you out of here.  You were an executive II or

12   ARB chairman for about 17 years, right?

13        **A.   Correct.**

14        Q.   Do you know how many chairpersons you had in

15   2017?

16        **A.   Five or six would be my guess.**

17        Q.   How about in 2018?

18        **A.   Maybe six or seven.**

19        Q.   I wanted to briefly touch on the grievance

20   process a little bit.  How much time does an inmate have

21   to file a grievance on an issue?

22        **A.   60 days.**

23        Q.   And is that 60 days from when an alleged

24   incident arises?

25        **A.   Correct.**

Further Examination by Ms. Sifuentes

1    about, there are no dates.  So we were -- it was a

2    hypothetical since he didn't give me a date of incident.

3    Could it have happened in November, sure.  It could have

4    happened in 2016.  He has to provide a date.  And so

5    that's what my original decision back to him was is,

6    one, I can't review it because you don't have facility

7    responses and, two, you need to provide a date.

8         Q.   Uh-huh.  But you know that this grievance was

9    accepted for emergency review by the warden in

10   January 2018, right?

11        A.   I only know that because you presented it,

12   but on this grievance there are no staff -- the two that

13   I got, there are no staff signatures on here.  So no, I

14   don't know that.

15        Q.   You know that because the document was later

16   sent to the -- I'm sorry, you're right.  You know that

17   because I showed you the version of the document that he

18   later submitted to the grievance officer?

19        A.   That is correct.

20        Q.   Yes.  And that version showed that he, in

21   fact, submitted it to the warden?

22        A.   Yes.

23        Q.   And it was accepted for emergency review on

24   January 18th, 2018.

25        A.   Correct.

Further Examination by Ms. Sifuentes

1      Q.   And could the warden have returned it and

2  asked for more information about the date?

3      **A.    Well, since I'm not privy to what that**

4  **particular grievance said, the warden's determination is**

5  **simply to determine if the information that he is**

6  **writing in there is of an emergency nature or not.  I**

7  **doubt that any warden per se would remand a grievance**

8  **for additional date.  The grievance officer absolutely**

9  **could make that recommendation, but in the paperwork**

10 **that you've shown me, the warden's action there simply**

11 **determined the words and the context meet the emergency**

12 **nature or not.**

13     Q.   Uh-huh.  So that the grievance that was dated

14 December 15th, 2017, at the top and December 18th, 2017,

15 at the bottom that was submitted to the warden on

16 January 18, 2018, was then submitted to the grievance

17 officer, right?

18     **A.    Correct.**

19     Q.   And there was a report issued on that

20 grievance?

21     **A.    Correct.**

22     Q.   And then the chief administrative officer,

23 the warden, made a decision?

24     **A.    Correct.**

25     Q.   In that grievance there was nothing left to

Further Examination by Ms. Sifuentes

1  do but send the report and the CAO response with the

2  grievance, the subject grievance to ARB to complete that

3  appeal, right?

4      **A.    Correct.**

5      Q.    So if Mr. Cobbs had sent that report to --

6  the CAO's response and that subject grievance to ARB, he

7  would have exhausted that appeal?

8      **A.    If timely filed, yes.**

9      Q.    If timely filed.  He could not timely file it

10  and exhaust his appeal if he never received the

11  grievance officer's report, right?

12      **A.    I guess that would be correct.**

13      Q.    You spoke a little bit about if he never

14  received it, there was a way for him to explain that to

15  you.  What would he have to do to show you that he never

16  received it?

17      **A.    Well, as I previously answered, he would**

18  **submit his grievance with a letter saying, hey, I filed**

19  **this grievance, I haven't gotten a response.  And I**

20  **would probably check the CHAMP entries to see if they**

21  **got it or not.  And I would send a form and send it back**

22  **to him saying in the future please check with staff for**

23  **updates.  Records reflect this is currently pending.**

24  **Please be patient.  When you get a response, then submit**

25  **all in accordance with DR 504.**

Further Examination by Ms. Sifuentes

1    Q.   So I think I just have two questions about

2  something else Ms. Patel asked you about, and that is

3  the other grievance, the February 15th, 2018, grievance.

4  And she asked you if Mr. Cobbs fully exhausted this

5  grievance and you said no, right?

6    **A.   I did.**

7    Q.   Because of the date of the grievance and the

8  date that he described the incident occurred, you

9  determined this grievance is untimely, correct?

10    **A.   It wasn't timely filed, yes.**

11    Q.   Was there anything he could do to cure this

12  untimely filing issue?

13    **A.   Not with this submission.**

14    Q.   So for this submission, there is no way for

15  him to properly fully exhaust this submission, this

16  grievance?

17    **A.   Not this one, no, because he's untimely.  I**

18  **mean, at the top, he dated 12/18/17 and at the bottom**

19  **where he signed it's February 15th.  I don't know why he**

20  **sat on this grievance and didn't file it for over two**

21  **months.  The date he signed is the end of this 60 days**

22  **already.**

23    **I don't know why he held this for that long.**

24  **And it's clear, because he wrote his own dates here,**

25  **he's the one that wrote February 15th of 2018.  That is**

1    **the 60th day from February -- I'm sorry, from**

2    **December 15.  She got it on March 1st.  I don't have any**

3    **reason to consider otherwise.**

4        Q.   I don't have any further questions.

5            MS. PATEL:  Can we go off the record to

6    explain signature and go back on.

7            (Off the record at 12:50 p.m.  Back on the

8    record at 12:51 p.m.)

9            MS. PATEL:  Okay.  Miss Benton, I explained

10   to you when we were off the record your options

11   regarding waiver of signature of the deposition

12   transcript.  So would you like to waive your signature

13   or reserve your signature.

14           THE WITNESS:  I'll waive.

15           MS. PATEL:  Okay.  Thank you so much.

16           (Whereupon, signature was waived, and the

17   witness was excused at 12:52 p.m.)

18

19

20

21

22

23

24

25

1                      CERTIFICATE

2

            I, SHERRIE L. MERZ, Registered Diplomate
3   Reporter, Certified Shorthand Reporter and Certified
    Court Reporter, do hereby certify that there appeared
4   before me by video conference,

5                      SHERRY BENTON,

6   who was by me first duly sworn to testify to the truth
    and nothing but the truth of all knowledge touching and
7   concerning the matters in controversy in this cause;
    that the witness was thereupon carefully examined under
8   oath and said examination was reduced to writing by me;
    and that this deposition is a true and correct record of
9   the testimony given by the witness.

10

            I further certify that I am neither attorney
11  nor counsel for nor related nor employed by any of the
    parties to the action in which this deposition is taken;
12  further, that I am not a relative or employee of any
    attorney or counsel employed by the parties hereto or
13  financially interested in this action.

14

            IN WITNESS WHEREOF, I have hereunto
15  subscribed my name this 21st day of September, 2020.

16

17                    *Sherrie L Merz*

18                    SHERRIE L. MERZ, RDR, CSR, CCR

19

20

21

22

23

24

25